[No. 22865.   Department Two.   May 19, 1931.]

G. W. HARTNETT, *Respondent*, v. STANDARD FURNITURE COMPANY, *Appellant*.[1]

*J. Speed Smith* and *Henry Elliott, Jr.,* for appellant.
*Pearson & Potts,* for respondent.

MILLARD, J.—Plaintiff, a fire department captain, brought this action to recover for personal injuries

[1]Reported in 299 Pac. 408.

sustained by him in the collision of a fire truck with the defendant's delivery truck at the intersection of Tenth avenue northeast and east Sixty-fifth street in the city of Seattle. The trial of the cause to a jury resulted in a verdict against the defendant. From the judgment entered on the verdict, motions for judgment notwithstanding the verdict and for a new trial having been overruled, the defendant appealed.

The alleged acts of negligence which respondent insists caused the collision are failure of appellant's driver to yield the right of way to the city fire truck, failure of appellant's driver to hear the fire siren, and operation of the delivery truck at an illegal rate of speed.

Appellant contends that the burden of proving the collision was caused by any negligence of appellant's driver has not been sustained by the respondent, and that respondent's contributory negligence precludes recovery against the appellant. It is argued that no real emergency existed; that respondent knew he was approaching a dangerous intersection; that respondent knew the law required a complete stop before entering the arterial highway which he was to cross; that he knew all traffic on this arterial highway must travel with the green light; that the fire apparatus did not slow down as it approached the intersection; that it entered before the furniture truck—which had entered with the green light—could cross the intersection; that, without seeing the furniture truck until it was halfway across the intersection, the fire truck drove blindly into the intersection and struck the furniture truck squarely in the side.

As usual, there is conflict in the evidence. In such case the facts are for the jury, and, unless physically impossible or naturally improbable so that reasonable minds could not differ thereon, we accept as

conclusive the fact necessarily resolved by the jury in respondent's favor. *Tooker v. Perkins,* 86 Wash. 567, 150 Pac. 1138. The version of the collision insisted upon by the respondent as true is supported by competent and substantial evidence, hence the jury were warranted in finding for the respondent.

The respondent was a captain of the Seattle fire department. About three p. m., July 19, 1929, the station of which he was in charge received telephonic information of the location of a fire. That it was not a conflagration, but merely a grass fire, was not learned by the respondent and the two firemen who accompanied him until subsequent to the collision. Obedient to the order of the respondent, a large fire truck immediately proceeded from the station along Ravenna boulevard, thence to east Sixty-fifth street towards the fire, which was a great distance east of the station, and in the northeast part of the city, known as the Ravenna district. The respondent sat on the front seat of the truck with the driver. Another fireman was on the rear of the truck.

The fire truck was traveling east on east Sixty-fifth street at the rate of twenty to twenty-two miles an hour upgrade, when it collided at the intersection of that street and Tenth avenue northeast with the appellant's furniture truck, which was proceeding south on Tenth avenue northeast, which was slightly downgrade, at the rate of from twenty-five to thirty-five miles an hour. The left front wheel of the fire truck hit the hub cap of the right front wheel of the furniture truck. At the time of the collision, a portion of the furniture truck was underneath the traffic light in the center of the intersection, and the fire truck was on the south side (its own right side of the street) of east Sixty-fifth street within the intersection. Respondent was thrown

from his seat on the fire truck and sustained the in-
juries for which he seeks to recover in this action.

Tenth avenue northeast is the main arterial high-
way entering the city through the University district.
The travel along that highway is so heavy that sev-
eral intersections along its course have been provided
with automatic electric signal devices. These signals
alternately turn red and green, stopping and starting
the traffic at these intersections. The intersection of
Tenth avenue northeast with east Sixty-fifth street
was provided with such electric signal device. Tenth
avenue northeast carrying more traffic than east
Sixty-fifth street, the interval between the change of
green signals on the former is much longer than on the
latter.

The city ordinance relative to the right of way of
fire department vehicles over all vehicles and the speed
at which vehicles may be driven across street inter-
sections, reads as follows:

"Vehicles of the fire department, when going to, on
duty at, or returning from a fire, shall have the right
of way over all vehicles and persons.

"Every operator of a vehicle, upon the approach of
the apparatus of the fire department, shall immedi-
ately proceed to the right hand curb and come to a full
stop, standing parallel thereto.

"At points where fire signals are located, when the
alarm sounds or fire signals are given, all operators of
vehicles within sight or hearing thereof, shall follow
the directions indicated above, and shall remain so
stopped until the fire signals cease sounding, and then
proceed only in the event that no fire apparatus is ap-
proaching, except where traffic officers are stationed.

"It shall be unlawful for any person operating any
vehicle, street car, locomotive or railroad car, in or
upon any street, or for any person standing or walking
in any such street, to fail, refuse or neglect to allow
the right of way to apparatus or members of the Fire

Department, when the same is going to, on duty at, or returning from a fire.

"It shall be unlawful to drive or operate within the corporate limits of this city, a vehicle at a rate of speed faster than twenty-five miles per hour, or to drive or operate such vehicle over or across any street intersection within said limits at a rate of speed faster than fifteen miles per hour.

"Every person operating or driving a vehicle of any character upon a public highway of this city shall drive the same in a careful and prudent manner and at a rate of speed no greater than is reasonable and proper under the conditions existing at the point of operation, taking into account the amount and character of the traffic, condition of brakes, weight of vehicle, grade and width of highway, condition of surface and freedom from obstruction to view ahead, and so as not to unduly or unreasonably endanger the life, limb, property or other rights of any person entitled to the use of the street or highway and in no event at a speed greater than twenty-five miles per hour.

"The following vehicles shall have the right of way in order named, in the use of all streets, viz:

"Apparatus of the fire department, vehicles and motorcycles of the police department, vehicles carrying United States mail, and succeeding the foregoing ambulances and repair vehicles of public service companies and of the city of Seattle, when responding to emergency calls."

The argument is advanced by appellant that, while fire department vehicles are given the right of way over other vehicles, and are excepted from the provisions of ordinances fixing speed limits, no exceptions are made to the provisions of the ordinance reading as follows, that all traffic must stop when a red signal is shown:

"Police semaphore signals: The following semaphore signals for the movement of traffic are hereby established:

"(a)  Red—When shown on any traffic signal, illuminated or otherwise, shall indicate that traffic shall

stop, and remain stopped as long as the red signal is shown, except street cars making right hand turns.

"(b)   Green—When shown in any traffic signal, illuminated or otherwise, shall indicate that traffic shall move in the direction of the signal and remain in motion as long as the signal is shown."

"All persons shall observe and comply with the directions of the traffic officers or signal devices used by them: *Provided, however,* That the motorman of a street car awaiting signal to proceed from his conductor shall not be required to start on the signal of the traffic officer."

As soon as the fire truck started from its station, a number of blocks distant from the scene of the collision, two sirens on the truck commenced to sound. One of the sirens was an automatic siren attached to a fly wheel, and sounded as long as the engine ran. The other was a hand siren. Nearly all of the witnesses for both sides testified that the siren on the fire truck was sounding as it approached the intersection. Some of the witnesses testified that they heard it a considerable distance back of the intersection. One witness, who was driving a truck one hundred and fifty feet to the rear of appellant's truck, heard the siren when he crossed the intersection of east Sixty-sixth street with Tenth avenue northeast, one block from the scene of the accident. Other witnesses testified that they only heard the siren immediately preceding the entry of the fire truck into the intersection. Some said the sound was loud and clear; others that the sound was faint.

All of the witnesses testified that, apparently, the driver and helper on the furniture truck did not hear the siren, and entered the intersection unconscious of its presence. The driver and his helper on the furniture truck, it would appear from their testimony, never heard the siren. The corner of the intersection be-

tween the two trucks as they approached was obstructed by buildings, so that the front of either truck would have to be parallel with the building line to enable the driver to see up and down the street on which the buildings faced.

The respondent was unable to testify whether the light was green or red when the fire truck entered the intersection. He testified:

"I have no memory of what occurred immediately prior to the accident."

The driver of the fire truck testified as follows:

"When Captain Hartnett reached the seat he gave me the location of 35th Avenue northeast and 65th street. I proceeded out on Oswego place to east 70th, turned on Ravenna boulevard and went over Ravenna boulevard to east 69th street. There were two automobiles pulling out side by side and I had to go in second gear to make that turn. There is a grade from Ravenna boulevard up to 10th and I went in second gear until *about fifty feet from 10th avenue northeast, where the light changed green and I slowed up in high and started on across.* . . . Q. From this point, fifty feet before you entered that intersection, just state what happened as you went into the intersection, if anything? A. When I was in high gear, the first thing I seen was the Standard Furniture Company truck loomed up right ahead of me. . . . Q. About when did you first see the Standard Furniture Company truck? A. I did not see that at all until they were right on top of me and close up in front of me. . . . I was going between twenty-two and twenty-five miles an hour. I just changed into high about forty feet from the corner. . . . I had the green light with me. . . . Q. Do you contend that your reason for going through 10th avenue northeast at twenty to twenty-five miles an hour was because of the fact that you claim that the green showed in your direction? Is that correct? A. That is correct. . . . Q. Was there any other reason of your attempting to go through 10th avenue northeast at

twenty-two to twenty-five miles an hour speed than that the green light was with you? A. At any time the green light shows with you you feel perfectly safe that you have the right of way to go through. Q. When the red light shows to you what do you do? A. When the red light shows against you you use caution. Q. Well, just what caution do you use; what do you mean by that? A. It means you would have your machine under control. Q. You mean by 'having it under control' that you should so drive it that if you discovered the traffic was going with the green light that you should so drive your car as not to collide with it? A. You would not run into anybody if you could help yourself . . . Q. Are you certain that the green lights were in your favor? A. Absolutely. . . . Q. You would not go through the red lights when you knew the green lights were telling other traffic to come on, would you? A. No. Q. And you say when you were fifty feet from that corner of 10th avenue northeast, when you were fifty feet west of it the light that you were facing turned green? A. The light come on green. Q. When you were fifty feet back? A. Yes. Around fifty feet.''

The other fireman on the truck testified that fire trucks go through the intersection when the lights are red against the truck; that, in driving through the intersection, the driver of the fire truck uses precaution but that ''If it is red he goes on anyway, but he uses precaution. Slows down.''

Appellant's driver testified that the light was green on Tenth avenue northeast when he started across the intersection; that he did not hear the fire siren; that he was driving twenty miles an hour; that no one signaled him to stop; that when he arrived at the intersection he looked to the left and to the right up and down east Sixty-fifth street and did not see the fire truck.

''You mean to say that nobody signaled you or that you don't remember, which? A. When I come to the

intersection, I remember that I looked to the left first and looked to the right. I did not see anybody there and the light was to go and I proceeded. Q. You say when you got to the intersection you looked to the left and then to the right and you did not see any fire truck coming? A. No. Q. And you saw nobody out there trying to flag you? A. No. Q. You heard no siren whatever? A. I didn't hear any. Q. And that was right at the property line? A. About here (pointing). Q. And about thirty feet more and the fire truck struck you? A. Yes.''

The assistant to appellant's driver, who sat on the seat with the driver, did not notice the light. He testified that he did not hear the siren. It would appear from his testimony that he did not see the persons trying to flag the truck.

One of respondent's witnesses testified that, when the car he was driving south on Tenth avenue northeast, entered the intersection with east 66th street, one hundred and fifty feet north of, or in the rear of, appellant's truck (or one block north of the collision), he heard the fire siren; that the light on Tenth avenue northeast at the intersection of east Sixty-fifth street was green;

''I was following the truck coming down, that is the Standard Furniture truck, coming down 10th avenue northeast. . . . As I came to the intersection of east 66th I heard the fire siren . . . I did not immediately turn to the curb as I usually do when I hear a fire alarm in other portions of the city. I knew that I had ample time to go to the curb, and I took a turn up 10th after leaving 65th. I heard the siren as I was crossing the intersection, one block north of the accident, and I followed down to, I would say approximately one hundred and fifty feet. I was going approximately the same speed as the truck. I followed down to approximately one hundred and fifty feet from the intersection when the accident occurred. I had, however, pulled my car over toward the curb, and I did

not see the actual impact. I did see, however, the two trucks swerve over to the other side of the street. Q. What did you estimate the speed of the furniture truck as it went down 10th avenue. A. I would say between twenty-five and thirty miles. Q. Did you notice whether it had slowed up any? A. My recollection is that it did slightly, as if in indecision; that is the way it looked to me, on the driver's part, as to whether it would go across, or not. At the time I heard the siren,—I don't know why I should have done it, but I looked down to see what the light was and the light was green on 10th avenue at that time. Q. That was at that time? A. Yes, sir, that was; that was one hundred and fifty feet away from where I was at the time of the impact, and I had swerved my car back from the Standard Furniture truck and there would have been ample time for the light to have turned red. I don't know whether it did or not. It was green when I was up on East 66th.''

That is to say, when this witness was one block north of east Sixty-fifth street and Tenth avenue northeast, while he was one hundred and fifty feet to the rear of the appellant's truck, the light was green on Tenth avenue northeast. He heard the fire siren, proceeded one hundred and fifty feet south on Tenth avenue northeast, noticed the appellant's driver, who had arrived at the intersection of east Sixty-fifth street and Tenth, slightly slowed his truck, then traveling at twenty-five to thirty miles an hour, was in doubt whether to venture across the intersection.

A truck driven by another witness of respondent crossed the intersection of east Sixty-fifth street and Tenth avenue northeast immediately preceding the collision. This driver, who was proceeding north on Tenth avenue, heard the fire siren when he arrived at the intersection of Tenth and Sixty-fifth. He looked to his left, the west, and saw the fire truck swinging on Ravenna boulevard, coming on east Sixty-fifth street.

The distance from Tenth avenue northeast and Sixty-fifth street to that point, according to one witness, is three blocks.

". . . if you hear it coming, you usually hear it when it turns into 65th? A. As a general rule, yes. Q. That is about three blocks down? A. Depends on which station the fire trucks are coming from. Q. But in this case it turns on about three blocks down from 10th? A. That would be about right, yes."

The witness drove his truck north on Tenth across the intersection with Sixty-fifth for a distance of seventy-five feet, and parked it. At this point, the furniture truck, proceeding towards the south on Tenth, was parallel with the truck of this witness. Coincident in time with the parking of the truck of the witness and the arrival of appellant's truck, several men ran out from the northeast corner, the east side of Tenth avenue northeast, and endeavored to flag the furniture truck. Appellant's driver and assistant were apparently oblivious of danger, as the speed of the furniture truck was not decreased and neither the driver or his assistant gave any heed to the persons attempting to stop the furniture truck. When the truck of this witness crossed the intersection of Tenth and Sixty-fifth, going north on Tenth, the light was green on Tenth. The witness was unable to testify whether the light was green or red when the accident occurred.

It is not at all improbable that the driver of the furniture truck did not hear the fire siren. The noise of his truck may have drowned the sound of the siren. Others, however, heard the siren, heeded the warning, and parked their cars as required by the city ordinance. Appellant's driver did not hear, neither did he see. He testified that, when he arrived at the intersection, he looked to the east and to the west on Sixty-fifth street and did not see the fire truck. It is incon-

ceivable that had he looked he would not have seen that truck. That vehicle was plainly visible for a distance of three blocks to the west a few seconds prior to the time the furniture truck attempted to cross the intersection. The fire truck was traveling twenty to twenty-five miles an hour, or from thirty to thirty-seven feet a second. Why the indecision of appellant's driver when he arrived at the intersection? The jury were warranted, under all the facts, in believing that the lights changed from green to red on Tenth immediately on the arrival of the furniture truck at the intersection; that, thinking he could clear the intersection before east and west bound traffic arrived at the intersection, appellant's driver "took a chance." The fire truck could not then have been more than two seconds' time distant from the intersection. When fifty feet west of the west curb line of Tenth, the light was green on Sixty-fifth, so the fire truck driver testified. If the fire truck was traveling at twenty miles an hour, that distance would be traversed within less than two seconds; if traveling at the rate of twenty-five miles an hour, the fire truck would have negotiated the distance within less than one and one-half seconds. The collision occurred about three o'clock the afternoon of a July day. No atmospheric conditions obstructed the view of the appellant's driver.

██ ██ Accepting as true the testimony of appellant's driver that he looked and failed to see the approaching fire truck, the driver was clearly negligent. There is no excuse for his failure to see the fire truck. We may disregard his failure to hear the siren, refrain from considering his infraction of the provision of the ordinance as to the rate of speed one may travel across an intersection, but we can not brush aside his testimony that he looked and failed to see a fire truck which could not have been more than a few seconds' time

distant from the intersection. Had he in fact looked, he would have seen. This was a clear July day at three o'clock in the afternoon. The vehicle, to one looking to the west on Sixty-fifth street, was plainly visible for a distance of three blocks some seconds prior to the time the furniture truck attempted to cross the intersection.

Similar in principle is *Herrett v. Puget Sound T. L. & P. Co.*, 103 Wash. 101, 173 Pac. 1024, where we said:

"Must not all say that the appellant either did not look for the approaching car, or his mind was so intent upon other things that the fact of its approach, physically open and apparent as it was and must have been, made no impression upon him? In either event, were not his acts so palpably negligent that there can be no two opinions concerning them? No reason or excuse is offered for appellant's failure to see the street car and avoid the collision, except that, after having looked as he says, when he passed the corner of the store building, he then gave his attention to his machine. This will not do. A driver of an automobile may not deliberately drive upon the street car track which is open and apparent, and excuse himself by saying that he looked and did not see that which no one could avoid seeing if he had looked; or that he was giving his attention to his machine, when common prudence demanded that he give some part of his attention to his own safety."

Appellant's driver insists that the green light was with him, an invitation to enter the intersection. He also insists that he was traveling at the rate of not more than twenty miles an hour; that, when he arrived at the intersection, he looked to the right and to the left, and, beholding nothing, proceeded across the street. Having looked, he will be held to have seen that which he should have seen, hence he saw the fire truck. It follows that, even if the green light invited him to enter the intersection (the verdict reflects the

refusal of the jury to accept that testimony as true), the danger of collision was so apparent it was the duty of appellant to yield the right of way. Though the vehicle on which respondent was riding was not a fire truck upon a pressing errand, the situation depicted by appellant's driver is one where it was the duty of such driver, though entitled by ordinance or statute to the right of way, to yield the right of way to the approaching vehicle.

In the case at bar, the duty to yield is intensified, rather than diminished, by the fact that the approaching vehicle was a fire department truck going to a fire. Persons in control of fire apparatus belonging to the city fire department are not "required to observe the ordinary speed limit fixed by ordinance for vehicles traveling upon the public streets." *Benefiel v. Eagle Brass Foundry,* 154 Wash. 330, 282 Pac. 213.

"The ordinary rules which are almost universal in their application regulating the conduct of persons engaged in the pursuit of their own private business or personal pleasure are not controlling in the case of members of a fire department answering an alarm of fire. . . . Fire is known to be one of the most useful and beneficial of human agencies, but it is also known to be one of the most destructive, and in case of a fire, unless prompt and heroic measures are resorted to, it frequently gets beyond control; and especially in large cities its toll of property runs into the millions, and the human lives that are sometimes its prey may be counted by the score. Society has recognized the fact that the individual efforts of the citizens are ineffectual under such circumstances, and has therefore provided trained men and specially equipped apparatus for the public protection, and in the present case to secure the highest efficiency in the operation of the apparatus and the best results in the efforts of the men to preserve life and property, the fire department is given the right of way by ordinance over the streets and alleys of the city, and all other

persons are required to yield such right of way so as not to obstruct the rapid passage of men and equipment to the place of danger. In answering calls to a fire the members of the department are sometimes required to take risks which would be negligent upon the part of the person engaged in his private business. It is often their duty to act in the face of considerable danger to themselves, when to hesitate or stop would result in disastrous consequences. Frequently haste and fearless performance of duty will avoid widespread disaster, and result in saving both life and property. To give timely warning to all persons of their approach and secure an uninterrupted passage of men and equipment as they rush along the streets to a fire, gongs or other suitable alarms are constantly sounded, and thus ample notice is given to all persons to avoid accident and interference. These signals are well known and recognized, and this right has been the outgrowth of necessity for the public good, and the requirement that individuals and vehicles engaged upon less pressing errands shall hold themselves in readiness to yield the right of way to men and equipment, is reasonable and generally recognized.'' *Oklahoma R. Co. v. Thomas,* 63 Okl. 219, 164 Pac. 120.

Appellant contends that the ordinance does not grant the right of way to fire department vehicles to the extent of permitting such apparatus to cross an intersection when the green light is showing favorably to the cross-traffic.

That question is not presented by this appeal. Had the respondent been riding on any vehicle, other than one of the fire or police departments, assuming that he was not violating the speed regulations, the question would be no different than the one now before us. Whether the driver of the fire truck would have crossed Tenth avenue northeast in the face of a red light, and whether he so drove previously, is not determinative of the question in the case at bar.

Was the negligence of appellant's driver the proxi-

mate cause of the collision, and was the respondent free from contributory negligence?

The evidence clearly establishes the negligence of appellant's driver. Oblivious of his surroundings, his thoughts elsewhere, that driver did not hear the fire siren which nearly every one else in that neighborhood heard and heeded. He failed to see the persons running out to flag his truck to prevent the collision when his truck was seventy-five feet from east Sixty-fifth street. He failed to see the fire truck when he looked in the direction from whence it was coming and when that truck was not many feet distant, then proceeded to cross the intersection at a speed violative of the ordinance, in the face of danger from which a prudent man would shrink. He testified that he entered the intersection with the green light in his favor, but it is not at all astonishing that the jury did not believe him, after listening to his testimony as to looking and not seeing that which he could not help but observe had he in fact looked. It is a reasonable inference from all of the facts that appellant's driver entered the intersection against the red light or as the green changed to red.

That the driver of the fire truck was not guilty of contributory negligence, is likewise clear. That driver was answering an emergency call, and was not required to observe the ordinary speed limit fixed by the ordinance for vehicles traveling upon the public streets. *Clark v. Wilson,* 108 Wash. 127, 183 Pac. 103. He was engaged in a governmental duty.

"In maintaining a fire department, a city is exercising a governmental function, and a fireman, instead of being considered as an ordinary employee of the city, 'is in fact a public officer and engaged in a governmental duty.'" *Benefiel v. Eagle Brass Foundry,* 154 Wash. 330, 282 Pac. 213.

The fire truck driver was fifty feet from the intersection, and at that time the light was green on Sixty-fifth. When it changed, he did not state. The light was with him. It was an invitation for him to proceed. He had the right of way. He did not see appellant's truck. There was no disregard of the signal light by the fire truck driver. He was not driving at an excessive rate of speed. His speed was twenty-two to twenty-five miles an hour. At the latter rate, he would have traveled one hundred and eleven feet within three seconds, or sixty-one feet east of the west curb line of Tenth avenue northeast. If appellant's driver was traveling, as he testified, at twenty miles an hour, he would have covered eighty-seven feet in the same period of time. The fire truck was half way across Tenth, and the appellant's truck was half way or more across Sixty-fifth, when the collision occurred. From our examination of the testimony, we are convinced that appellant's automobile entered the intersection at Tenth avenue almost coincident in time with the entry of the intersection on Sixty-fifth street of the fire truck.

Under these facts, the jury could not have found other than that the negligence of the appellant's driver was the proximate cause of the collision and that the driver of the fire truck was not guilty of contributory negligence.

■ Appellant assigns as error the refusal of the trial court to give the following instruction:

"If you find under the evidence that the sole cause of the collision herein was the failure of the proper authorities to so arrange the signal lights at the intersection in question that the same could be controlled by the fire department when sending its apparatus across the said intersection your verdict should be for the defendant."

The signal light at the intersection of Tenth avenue northeast and east Sixty-fifth street had no arrange-

ment by which all lights in the four directions could be turned red at the same time. The lights of the down town intersections, and some in the outlying sections of the city, are so equipped that, by means of an electrical control, the red lights can be made to show in all directions, simultaneously stopping all traffic. Where the intersection lights are so equipped, the fire department can, by electrical control, cause all lights to be turned red at crossings where fire apparatus is traveling, so as to hold all traffic until the fire trucks have passed through the intersection.

It does not follow that, because some lights are arranged in a certain manner, the duty is imposed upon the city to arrange all of the lights in the same way. It would be as reasonable to hold that, in the case of a collision at an intersection having no lights, the court would be required to instruct the jury that, because, at intersections carrying like heavy traffic as the one at which the collision occurred, signal lights were installed, *ergo,* the city was required to provide the same equipment at the intersection in question; that, if the failure of the city to install such lights at the intersection was the sole cause of the collision, the jury should find for the defendant.

That the red light was showing on Tenth avenue when appellant's driver entered the intersection, is fairly to be inferred from all of the evidence. That red light did not retard him, nor was he deterred thereby from entering the intersection. How four red lights would make any difference to such a driver because one would be to the north, one to the south, one to the east and one to the west, is difficult to understand. The driver could see only one red light at a time, the one immediately ahead of him. The negligence of a driver entering against one of the four red lights would be no more glaring or gross than where he

entered against a red light and the lights for the cross traffic were green. The fact that, where all lights were red, the fire department trucks would have an undoubted right of way, is no different than in the instant case, as the fire department had the right of way by virtue of the green light being with it. The question would be present in a case where the four lights would be red, as in the case at bar, whether the defendant entered the intersection against the red light.

█ The denial of appellant's motion for a new trial on the ground of newly discovered evidence is next assigned as error.

It appears that on June 22, 1921, or nine years prior to the trial of this cause, the respondent made an application for retirement as a city fireman, upon the grounds that he suffered from "deafness brought on from catarrh and exposure, and being exceedingly nervous and other trouble." The application was a part of the files of the pension board of the Seattle fire department. Prior to the trial, the appellant and its attorney did not know of the existence of that application. On the last day of the trial, one of appellant's attorneys heard that such an application was in the records of the fire department. A careful search was made by the attorney, but the records did not disclose the application. Subsequent to the trial, another search was made, and the application was found.

The trial court said, in denying the motion for a new trial:

"Now, with respect to this alleged newly discovered evidence. The jury had before it the doctors of the department. Chiefs who were in authority, superior to the plaintiff, and who, in addition to the plaintiff, testified before the jury as to the plaintiff's illness and indispositions prior to the happening of this accident, together with some of the records of the fire depart-

ment. The only thing in the suggestion now made that causes the Court any serious consideration is the suggestion of a letter from the plaintiff to the Pension Board in which he himself states that he had previously suffered from a nervous condition. But it seems to the court that if that testimony had been produced at the trial it would have been only cumulative of other testimony that the jury had before it and would not, in any manner, materially have affected the result. There cannot be any question in the mind of anybody, after hearing the undisputed evidence in this case, that the plaintiff suffered a serious injury as a result of the accident by being thrown from a fire truck on to the pavement, and whether it was a complete fracture of the skull or only a depression that caused pressure upon the brain, was not exactly clear, as I now recall it; but it was some result of that accident, as disclosed by the testimony, that caused some disorganization of the brain functions as a positive result of this accident. The court is well satisfied with the verdict of the jury. The only thing that the Court has in mind is whether this evidence which is said now to be available would in any manner affect the minds of the jury as to the measure of damages. I do not believe it would.''

Nine years ago, the respondent, as he stated in his application of June 22, 1921, for retirement, suffered from ''deafness brought on from catarrh and exposure, and being exceedingly nervous and other trouble.''

Respondent's principal injury sustained in the collision is one to the brain. One physician testified:

''The condition at the present time as I see it is a disturbance in his mental processes due to an injury in this region, which is the part of the brain that controls our finer thoughts and the weakness of the motor mechanism which controls from this side of the brain the right arm and right leg.''

One of appellant's physician witnesses, who had known the respondent for fifteen years, testified fully as to the respondent's condition, and particularly as

to the question of nervousness. He testified that he did not see any difference in respondent's condition before the accident than it was after the accident. Surely, had the respondent been highly nervous prior to the accident, this physician would have so testified.

Another physician, who knew the respondent for eight years, testified:

"Before the accident he was a big, strong, healthy fireman, a captain in the fire department, and you have to be in pretty good mental and physical condition to be a captain or an officer in the fire department . . . but his nervous condition and his mental condition I believe have deteriorated since the accident."

He testified on cross-examination, "Well, I suppose you would call him a nervous temperament, yes." The respondent called at this physician's office regularly every two weeks, ten days, or a month, for the past five or six years with throat trouble, a chronic catarrh condition. The respondent testified that he was slightly deaf before the accident; that

"No, really, I was not a nervous man before the accident. Oh, I can't say I was never nervous. No, sir, I was not nervous before the accident, not when you say nervous."

While appellant's counsel were not aware of respondent's application, made nine years previously, for retirement, one of appellant's counsel at length cross-examined the respondent as to his deafness and nervousness prior to the accident. The matter of respondent's nervousness was gone into fully on cross-examination.

We agree with the trial court that the newly discovered evidence is cumulative. We are unable to say that the newly discovered evidence, if believed by the jury, should, or probably would, produce a different result. Such question is addressed to the sound dis-

cretion of the trial court, which has not been abused in this instance.

"After all, it must not be forgotten in any case that the motion for a new trial on this ground is addressed to the discretion of the trial court, and that the discretion is a real one conferred to attain the end of substantial justice. As said in *Oberlander v. Fixen & Co.* [129 Cal. 690, 62 Pac. 254]:

" 'Whether the evidence is of this character is not a question of law but for the judgment of the trial judge, whose discretion will not be interfered with by this court except in cases of manifest abuse. Hence, where the motion is denied, the fact that the newly discovered evidence is merely cumulative will in general be a sufficient ground for affirmance; but where the motion is granted, the contrary will hold. For, in either case, it is for the trial judge to determine whether the evidence is of character probably to affect the result on a new trial; and unless the evidence be of such a character as to make it manifest and certain to this court that in the one case it would, or in the other that it would not, result differently on a retrial, the order will not be disturbed.'

"We cannot say that the newly discovered evidence here offered, if believed by the jury, should not, or probably would not, produce a different result. The question whether a different result is probable or ought to follow is, from its nature, one peculiarly addressed to the discretion of the trial court. That discretion was amply invoked by the moving and counter affidavits. No rule is more strongly supported, both in reason and by authority, than that the exercise of that discretion will not be disturbed except in case of manifest abuse." *Roe v. Snyder,* 100 Wash. 311, 170 Pac. 1027.

The judgment should be, and it is, affirmed.

TOLMAN, C. J., BEELER, FULLERTON, and BEALS, JJ., concur.